# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| KIMBERLY JOHNSON<br>     Plaintiff, | No. 3:16-cv-01141 (MPS) |
| v. | |
| THE GUARDIAN LIFE INSURANCE COMPANY<br>OF AMERICA.<br>     Defendant. | |

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Kimberly Johnson ("Plaintiff") sued Defendant The Guardian Life Insurance Company of America ("Defendant") under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, after Guardian terminated her long-term disability ("LTD") benefits under an employee benefit plan. Plaintiff contends that Defendant's termination decision was arbitrary and capricious. The parties have filed cross motions for summary judgment. For the reasons set forth below, Plaintiff's motion is GRANTED and Defendant's motion is DENIED.

## I.      Factual Background

The following relevant facts, which are taken from the parties' Local Rule 56(a) Statements and the Administrative Record ("AR"), are undisputed unless otherwise indicated.

### A.  Plaintiff's Claim for Benefits

Plaintiff worked as a sales director for Greenfield Direct, LLC ("Greenfield"). (ECF No. 19 ¶ 1; AR 0006.) Greenfield provided LTD benefits to its employees, including Plaintiff, under an employee benefit plan ("the Plan") administered by Defendant. (ECF No. 19 ¶ 2; AR 1780-1996.)

1

On March 10, 2010, Plaintiff stopped working due to headaches, fatigue, vomiting, and nausea. (ECF No. 19 ¶ 6; AR 0006, 1596, 1999). Plaintiff filed an application for LTD benefits and Defendant approved her application. (ECF No. 19 ¶ 7; AR 0006, 1596, 1999.) Plaintiff began receiving LTD benefits from Defendant on June 13, 2010. (ECF No. 19 ¶ 8; AR 1599.)

In July 2011, Defendant requested that Plaintiff file a disability claim with the U.S. Social Security Administration. (AR 1502.) In November 2011, Defendant informed Plaintiff that it had referred her file to a law firm, which Defendant selected, that specialized in Social Security law and could assist in pursuing Plaintiff's Social Security claim. (AR 1506-07.) Defendant noted that the representation would not result in any out-of-pocket cost to Plaintiff, and that it would pay the attorney. (AR 1507.)

Defendant paid LTD benefits to Plaintiff for the first 24 months of Plaintiff's disability, from June 13, 2010, through June 13, 2012, and continued to pay benefits after June 13, 2012, based on periodic reviews through which Defendant concluded that Plaintiff remained eligible for benefits. (ECF No. 19 ¶¶ 9-10; ECF No. 16-2 ¶¶ 7-9, 11, 13; AR 1599, 2018.) Through these periodic reviews, Defendant concluded in March 2013, August 2013, December 2013, and August 2014 that Plaintiff remained eligible for LTD benefits due to her continued functional limitations. (ECF No. 16-2 ¶¶ 28-29; AR 2078, 2105.)

On May 7, 2015, the Defendant denied Plaintiff's claim for LTD benefits, stating that Plaintiff was no longer disabled within the meaning of the Plan. (AR 896-900.) On October 28, 2015, Plaintiff initiated an appeal of the denial, after which Defendant reconsidered its decision. (AR 429-530; AR 2150.) On May 12, 2016, Defendant denied Plaintiff's appeal. (AR 3.)

Plaintiff asserts that her disability is caused by a cervical spinal stenosis with severe occipital headaches and a history of a cervical fusion, a severe mid-thoracic disc protrusion

deforming her spinal cord, Crohn's disease, a total colectomy which requires use of a colostomy bag, and sinus tachycardia. (ECF No. 16-2 ¶ 5.) Defendant contends that Plaintiff's only disabling diagnosis is her cervical spinal stenosis with severe headaches and cervical fusion, as the other conditions arose either before or after Plaintiff's date of disability, and Plaintiff did not claim to be disabled due to those conditions in her initial claim or appeal. (ECF No. 33 ¶ 5.)

### B. Plan Terms

The Plan states, "Guardian is the Claims Fiduciary with discretionary authority to determine eligibility for benefits and to construe the terms of the plan with respect to claims." (ECF No. 19 ¶ 4; AR 1847.) The Plan also contains the following relevant provisions with respect to LTD benefits:

> Proof of Loss
> . . . .
> We require the items listed below as proof of loss:
>
> (a)
>  . . . .
> After the own occupation period, medical evidence in support of the limits on your ability to perform any gainful work.
>
> . . . .
>
> When Payments End
>
> Your benefits from this plan will end on the earliest of the dates shown below:
> (a)      The date you are no longer disabled.
> (b)      The date you earn, or are able to earn, the maximum earnings allowed while disabled under this plan.
> (c)      The date you are able to perform the major duties of your own occupation on a full-time basis with reasonable accommodation that an employer is willing to provide.
> (d)      After the own occupation period, the date you are able to perform the major duties of any gainful work on a full-time basis with reasonable accommodation that an employer is willing to provide.
> . . .
> (h)      The date you fail to give us required current proof of loss. This includes taking part in any medical or vocational assessment we may require.

(i)     The date you are no longer under the regular care of a doctor.

. . .

(AR 1827.)

The Plan provides the following relevant definitions:

Disability or Disabled

These terms mean you have physical, mental or emotional limits caused by a current sickness or injury. And, due to these limits, you are not able to perform the major duties of your own occupation or any gainful work as shown below:

(1)     During the elimination period and the own occupation period, you are not able to perform, on a full-time basis, the major duties of your own occupation.
(2)     After the end of the own occupation period, you are not able to perform, on a full-time basis, the major duties of any gainful work.

. . . .

Gainful Occupation or Gainful Work

Work for which you are, or may become, qualified by: (a) training; (b) education; or (c) experience. When you are able to perform such work on a full-time basis, you can be expected to earn at least 60% of your indexed insured earnings, within 12 months of returning to work.

(AR 1839.) The Plan states that the "Own Occupation Period" is "[t]he first 24 months of benefit payments" from the Plan, and that the "Elimination Period" is 90 days. (AR 1822.)

## C.  Administrative Record

The Administrative Record before the Court is a 2,198-page file containing the Plan, Defendant's files concerning Plaintiff's benefits, Plaintiff's medical records, and other documents submitted by Plaintiff as part of her administrative appeal. The relevant portions of the administrative record are summarized below.

Medical notes indicate that Plaintiff has a history of Crohn's disease and uses a colostomy bag. (AR 1580.) Plaintiff underwent a cervical fusion (surgery that joins bones in the neck) in July 2012 and a cholecystectomy (gall bladder removal surgery) in August 2014. (ECF No. 19 ¶ 11;

AR 0059, 0060.) Following these procedures, Plaintiff continued to complain of back pain and was under the care of several physicians, including an orthopedic spine surgeon, Dr. James Yue, and a pain management specialist, Dr. Dwight Ligham. (ECF No. 19 ¶ 12; AR 1004-1005, 1246, 2024-2127.)

On August 30, 2012, Dr. Ligham provided Plaintiff, at the request of Plaintiff's Social Security attorney, with a written opinion regarding Plaintiff's functional capabilities, opining that Plaintiff was "very disabled requiring frequent rest breaks up to 10 minutes per hour and requiring changes in position several times per hour." (AR 1182-83.) In December 2012, also at the request of her Social Security attorney, Dr. Ligham provided an updated opinion regarding Plaintiff's work capacity, writing that Plaintiff "continue[d] to be restricted from any work due to the limitations outlined in" the August 30 letter. (AR 1181.)

On June 28, 2013, Plaintiff's treating neurologist Dr. Sanjay P. Rathi conducted a motor examination of Plaintiff and concluded that Plaintiff suffered from weakness in her upper extremities and had abnormal reflexes, warranting an MRI. (ECF No. 16-2 ¶ 18; AR 571-72.) The MRI results identified "a paracentral focal disc protrusion indenting the thecal sac and deforming the cord anterolaterally" and "severe left neuroforaminal stenosis." (ECF No. 16-2 ¶¶ 19-20; AR 553-54.)[1] At the request of Plaintiff's Social Security counsel, Dr. Rathi provided Plaintiff with a medical opinion in which he concurred with Dr. Ligham's assessment. (ECF No. 16-2 ¶ 22; AR 1184.) Dr. Babu Kumar, Plaintiff's treating internist, also provided a medical opinion concurring

---

[1] The "thecal sac" is a membranous sac covering the spinal cord containing cerebrospinal fluid. *See* Medical Dictionary, Merriam-Webster.com, https://www.merriam-webster.com/medical/ thecal%20sac. "Neuroforaminal stenosis," or neural foraminal stenosis, refers to a compression of a spinal nerve as it leaves the spinal canal through the foramen, the opening between the vertebrae through which spinal nerve roots travel and exit to the other parts of the body. *See* Neural Foraminal Stenosis Definition, Spine-Health.com, https://www.spine-health.com/glossary/neural-foraminal-stenosis.

with Dr. Ligham's assessment that Plaintiff was unable to work, also at the request of Plaintiff's Social Security counsel. (ECF No. 16-2 ¶ 23; AR 1185-1186.)

In September 2013, as part of Plaintiff's Social Security case, Plaintiff submitted to the Social Security Administration an opinion of a Vocational Expert "for the purpose of convincing the SSA that [Plaintiff] was eligible for Social Security Disability Benefits." (ECF No. 16-2 ¶ 24.) The expert's fees were paid by Defendant. (*Id*.; AR 1200-04.) The vocational expert opined that Plaintiff was "unable to return to any of her past relevant work," and that, "[p]hysically, the restrictions outlined by Dr. Ligham place[d] [Plaintiff] at less than the full range of sedentary work . . . . Moreover the limitations of interference with her ability to maintain concentration and complete tasks in a timely fashion precludes [Plaintiff] from maintaining sufficient concentration and pace to complete an 8 hour workday on a sustained basis." (AR 1204.) On October 23, 2013, an Administrative Law Judge found Plaintiff to have been disabled as of March 10, 2010. (AR 1199.) Plaintiff's social security attorney informed Defendant of the outcome in Plaintiff's favor. (AR 1199.)

On August 8, 2014, Defendant undertook a periodic review of Plaintiff's eligibility for benefits, concluding that Plaintiff remained eligible for LTD benefits, and suggesting that it would not conduct another review until 2016. (ECF No. 16-1 at 11-12; AR 2119.)

On August 20, 2014, Plaintiff was seen by Dr. Yue for a routine check of her thoracic disk herniation. (ECF No. 19 ¶ 13; AR 443.) Dr. Yue noted that Plaintiff was "doing well overall with regard to the herniation" and that she had "come down on her pain medications with Dr. Ligham pretty far." (ECF No. 19 ¶ 13; AR 443.) Dr. Yue further noted that Plaintiff's exam that day was "benign," that Plaintiff had a "[n]ormal unassisted gait," and that "[n]o myelopathy was evident."

(ECF No. 19 ¶ 13; AR 443.) Dr. Yue noted that Plaintiff's son would be going to college, and that Plaintiff was "going to help him move in shortly."[2] (ECF No. 19 ¶ 13; AR 443.)

Medical notes written by providers at Advanced Diagnostic Pain Treatment indicated that Plaintiff continued to discuss pain treatment with doctors in late 2014 and early 2015. A medical noted dated November 25, 2014 stated, "Pain generators continue to be her low back and her neck. . . . We discussed options for pain control." (AR 488.) In late January 2015, a medical note indicated that Plaintiff was taking fentanyl, and that there would be no change to her medication at that time.[3] (AR 487-88.) The note stated, "Pain generator: neck and right buttocks. (AR 487.) The note also stated that Plaintiff reported "a 30-40 % pain relief" from her medication regiment. (*Id.*)

Defendant's notes indicate that it learned on February 18 and February 24, 2015, that Plaintiff's benefit payment could no longer be offset by social security payments received by her son, such that her benefit had to be recalculated and increased to correct for an underpayment. (AR 2123-24.) Shortly thereafter, between February 25 and March 4, 2015, Defendant's notes indicate that Defendant requested a Physical Capabilities Evaluation ("PCE") from Plaintiff, and that Defendant called Plaintiff to request updated information for her file. (AR 2125-26.)

---

[2] In an unsworn statement submitted in support of her appeal, Plaintiff noted that her son "is a strong football player," and that "[a]ll the lifting and moving . . . was done by [her] son and his teammates." (AR 717.) Plaintiff also submitted with her appeal a print-out of an apparent webpage containing the biography of Gabriel Johnson, a football player, which lists height as "6-2" and weight as "320." (AR 823; *see also* AR 2150 (noting a conversation between Teresa Crouthamel, a benefits administrator for Defendant, and Plaintiff's counsel regarding the fact that Plaintiff "did not have to help [her son] move – he is capable of doing so and his teammates helped").)

[3] The parties do not dispute that this note was written by Dr. Ligham, Plaintiff's pain management specialist, but this is unclear from the record. (*See* ECF No. 19 ¶ 14; ECF No. 32 ¶ 13; AR 487-88.)

On March 17, 2015, Dr. Ligham completed a PCE Form for Plaintiff at Defendant's request (AR 2127), indicating that Plaintiff was not capable of working any hours per day, and that Plaintiff could not sit for any hours per day. (AR 1006.) Dr. Ligham indicated that Plaintiff could operate computers or office devices, but noted that Plaintiff could not stand for more than 10 to 30 minutes at a time, could not sit for more than 10 to 15 minutes without changing positions, and could not walk for more than 15 to 30 minutes without having to sit. Dr. Ligham noted that Plaintiff was unable to lift, bend, squat, reach, pull, or push. (AR 1007.)

On April 7, 2015, Dr. Yue completed a PCE Form for Plaintiff, at Defendant's request (AR 911-12, 945, 2128), indicating that Plaintiff could sit for two hours at one time, and stand and walk for one hour at one time; could sit for a total of eight hours, stand for a total of two hours, and walk for a total of one hour during an average work day; could continuously lift or carry up to five pounds, frequently lift or carry between six and ten pounds, and could occasionally lift or carry between 11 and 20 pounds. (AR 941.) Dr. Yue indicated that Plaintiff could "operate desk machines" and "perform precise manual dexterity," and that Plaintiff could perform "sedentary work" or "light work." (AR 943, 2129.)

Defendant noted the discrepancy between Dr. Yue's and Dr. Ligham's PCE Forms and that it would "need to clarify." (AR 2128.) Defendant contacted Dr. Ligham multiple times following receipt of Dr. Yue's PCE to inquire about the discrepancy. (AR 908-912, 932-936, 2130-2134). Specifically, Defendant sent Dr. Ligham the PCE Form completed by Dr. Yue, and asked Dr. Ligham:

> Do you feel that the patient is capable of sedentary work? Y/N
> Do you feel that the patient is capable of light work? Y/N
> If no, please explain the discrepancy between the physical capability forms completed by you and Dr. Yue.
> What are the specific restrictions?
> What are the specific capabilities?

What objective medical evidence supports the restrictions?

(AR 909.) A note in Defendant's files dated May 6, 2015 states, "[Employee] pain doc has not responded providing specific information contradic[ting] the [employee] ortho doc – as this is the case, will base our decision on the info in file – we are aware [employee] is capable of perform[ing] own occ based on physician restrictions as the occ is done in the general labor market – will [wait] to see if [employee] also capable of gainful work[.]" (AR 2133.)

Also on May 6, 2015, Defendant completed a "Change in Definition Review" with respect to Plaintiff, including a Transferability of Work Skills Worksheet and Labor Market Survey, listing Plaintiff's acquired skills through her prior employment,[4] "residual functionality," and occupations in Plaintiff's "geographical-economic locale" that Defendant deemed to be viable employment options for Plaintiff. (AR 893-895.) The worksheet noted, "A [PCE] was completed by Dr. Yu on 4/1/15. Dr. Yue has allowed for light level work on a full time basis with lifting to 20 lbs occasionally." (AR 894.) The worksheet did not mention the PCE completed by Dr. Ligham. The Labor Market Survey listed 20 "viable employment options," with hourly wages ranging from $18.55 to $48.67. (AR 894-895.)

### D. Defendant's Denial of Benefits

On May 7, 2015, Defendant informed Plaintiff of its decision to terminate Plaintiff's LTD benefits. (AR 896-900.) In its letter, Defendant stated that it had reviewed the PCE and office visit notes completed by Dr. Yue, and noted that Dr. Yue indicated that Plaintiff was "capable of full-time light duty work" on the PCE and that Plaintiff was "doing well overall" in her last office visit. (AR 896.)

---

[4] Plaintiff provided Defendant with information regarding her employment history in a telephone interview with a Guardian Claims Case Manager on June 11, 2010. (ECF No. 19 ¶ 23; AR 1708-1709.)

On May 12, 2015—after Defendant conveyed its decision terminating Plaintiff's benefits to Plaintiff—Defendant received a response via fax from Dr. Ligham regarding the discrepancy between Dr. Ligham and Dr. Yue's PCEs. (AR 882.) In response to the questions "Do you feel that the patient is capable of sedentary work? Y/N" and "Do you feel that the patient is capable of light work? Y/N," Dr. Ligham circled "N" for both questions. (AR 883-884.) Dr. Ligham noted that Plaintiff "needs to change positions hourly, to recline 4x/8hrs." (*Id.*)[5]

On May 20, 2015, Plaintiff confirmed that she would initiate an appeal of Defendant's decision, based on the receipt of Dr. Ligham's response.[6] (AR 879, 2138.)

On August 27, 2015, Dr. Rathi, conducted a neurological reevaluation of Plaintiff. (AR 448). Dr. Rathi wrote in a report of his follow-up visit with Plaintiff,

> Unfortunately, the patient is distressed because she has been told by her orthopedic surgeon that she may simply return back to work. Unfortunately, she continues to have severe low back pain, thoracic pain, and has chronic issues with her cervical spine despite having undergone surgery for the degenerative changes therein years ago and probably having manifestations of residual myelopathy . . . . The patient reports that she recalls a conservation [*sic*] with Dr. Yue years ago when she was in the process of obtaining Disability that given the thoracic spine pathology relating to the disc, that she should do no bending, lifting, twisting, or pushing/pulling. The patient is surprised to hear that Dr. Yue has stated that she may simply return back to work adding that she has continued difficulties, essentially unchanged from her baseline years ago and continues to require pain management being aggressively pursued by Dr. Ligham. . . . I found myself . . . in full agreement with the patient's assertions and I am confounded by the reported decision by Dr. Yue to state that the patient is sufficiently improved that she may now return back to work though clearly, she remains in severe pain and as far as I am aware, the pathology of her thoracic spine has not been addressed to date.

(AR 448.)

[5] As Defendant noted in its files, Dr. Ligham's notes are not fully legible. (AR 883-884, 2137.)
[6] Plaintiff's counsel thereafter indicated to Defendant that he would be submitting a formal appeal within the requisite 180-day period, such that Plaintiff's phone call with Defendant would not be construed as a final submission of her appeal. (ECF No. 19 ¶¶ 29-33.)

On September 23, 2015, Plaintiff returned to Dr. Yue for a consultation regarding her thoracic spine. (ECF No. 16-2 ¶ 41; ECF No. 19 ¶ 35; AR 441.) Dr. Yue noted that Plaintiff was having numbness in her legs. (AR 441.) Dr. Yue noted that Plaintiff "recently obtained a new MRI of her thoracic spine," which showed a "right-sided paracentral disk bulge that is displacing the spinal cord." (*Id.*) Dr. Yue also noted that he was "ordering a CT scan of thoracic spine in preparation for a thoracic discectomy that most likely this patient will require in the near term future. The patient understands that the thoracic disk herniation procedure can be more risky than the cervical and/or lumbar and that paraplegia secondary to vascular insufficiency can occur. This is a rare event, but it is a possibility in this particular type of decompression." (*Id.*) Dr. Yue noted that the "[e]xam today showed normal unassisted gait" and "[n]o motor deficits were appreciated." (*Id.*) The same day, Dr. Yue wrote in a letter addressed "To Whom it May Concern," "Kimberly Johnson was seen in my clinic on 9/23/2015. Ms. Johnson is not allowed to return to work until further notice." (AR 512, 808.)

In a letter dated October 16, 2015, Plaintiff's counsel asked Dr. Yue to "confirm that, in light of [his] medical findings after April 7, 2015, [he] now believe[d] that [Plaintiff was] not capable of performing either light or sedentary work." (AR 514.) The letter also asked Dr. Yue "to complete the attached physical capabilities evaluation in order to further clarify [his] position." (*Id.*) Dr. Yue responded on October 20, 2015, indicating his agreement with the statement, "I agree that Ms. Johnson is not able to work either at a light or at a sedentary level of strength." (*Id.*) In the attached "Functional Capacity Assessment" form, Dr. Yue indicated that Plaintiff suffered from "chronic pain/paresthesia," would not be able to perform work at a sedentary or light level of strength, was likely to be "off task" for 25% or more of a typical workday, and would likely be absent more than four days per month if she tried to work full-time. (AR 515-516.)

### E. Plaintiff's Appeal

On October 28, 2015, Plaintiff filed an administrative appeal of the denial of her LTD benefits, including an appeal letter and a package of medical records and opinions. (ECF No. 16-2 ¶ 44; AR 429-530; AR 725-826.) She argued in her appeal letter that she was entitled to LTD benefits as a result of her cervical stenosis and the deformation of her thoracic spine, which rendered her unable to perform any gainful occupation. (AR 436.) The exhibits accompanying the letter amounted to approximately ninety pages of documents, including medical records from Dr. Yue, Dr. Rathi, cardiologist Dr. Babu Kumar, and Dr. Ligham and Batya Levitan of Advanced Diagnostic Pain Treatment; MRI radiology reports; and records from the Yale Nephrology Clinic. (AR 439-530.) Also included were a statement from Plaintiff, Dr. Yue's September 23, 2015 letter indicating his belief that Plaintiff could not return to work, Dr. Yue's October 20, 2015 Functional Capacity Assessment, and information about Plaintiff's son, Gabriel Johnson. (*Id.*)

Defendant initiated a reconsideration review following receipt of Plaintiff's appeal materials. (AR 2150.)

On October 30, 2015, Plaintiff's counsel informed Defendant that Plaintiff had visited Dr. Yue on October 28, 2015, the same day she filed her appeal with Defendant. Dr. Yue's medical note from that visit indicated that Plaintiff and Dr. Yue had decided to proceed with thoracic spine surgery, and that "the patient is losing neurological function including bladder function and ambulatory issues." (AR 705-706, 2151.) Defendant acknowledged on November 3, 2015 that the October 28, 2015 medical note from Dr. Yue would be considered as part of Plaintiff's appeal. (AR 709.)

On December 18, 2015, Defendant sent Plaintiff's file for a Multi-Disciplinary Peer Panel Review by an orthopedic spine surgeon, Dr. Cheng-Lun Soo, and an anesthesiologist and pain

medicine physician, Dr. Eric Lonseth. (ECF No. 16-2 ¶ 46; AR 678-680.) The letter Defendant

sent to the Multi-Disciplinary Panel indicated that Plaintiff's claim had been "closed" on May 12,

2015, "[b]ased on review of all the information in the file," and after Defendant was unable to

obtain clarification regarding the discrepancy between Dr. Yue's and Dr. Ligham's PCEs. (AR

678.) Based on a review of Plaintiff's medical documentation, a surveillance report and video

showing Plaintiff walking, driving, entering stores, and carrying small items over a three-day

period in April 2015, and a discussion with Dr. Soo,[7] Dr. Lonseth concluded that "[f]rom a pain

management standpoint, there would be no indication of specific documentation that would

support functional limitations or restrictions as of 05/12/2015." (AR 390; *see also* AR 2164-65.)

Dr. Lonseth noted that

> [t]he claimant's pain medicine treatment dates back to 2002. It is noted to be for
> chronic complaints of both neck and low back pain for which the claimant is
> apparently stable on current doses of medications including long term use of
> opioids. While there is noted to be underlying treatment from an orthopedic
> standpoint including surgical process to the cervical spine, the claimant's chronic
> complaints of pain particularly to the low back would currently support no evidence
> of physical examination findings and/or documentation of recent treatment to
> support restrictions and/or limitations.

(AR 390.)

Dr. Soo reviewed the same medical documentation, surveillance report and video, and

agreed with Dr. Lonseth that "the clinical evidence does not support impairments related to the

claimant's complaints of pain in the cervical, thoracic and lumbar spine as physical examinations

were lacking and there was no clear evidence of significant deficits upon assessment." (AR 406;

AR 2164-65.) Dr. Soo indicated that he called the phone number listed for Dr. Yue and left

---

[7] Dr. Lonseth indicated that he called the phone number listed for Dr. Ligham on three separate
dates and left messages, but does not indicate that he ever had a discussion with Dr. Ligham. (AR
388).

messages on three separate occasions, but did not indicate that he spoke with Dr. Yue. (AR 405-06.) Dr. Soo opined that "the claimant's primary diagnosis is displacement of thoracic intervertebral disc without myelopathy" (AR 407), but that Plaintiff was "not shown to have significant gait abnormalities or balance issues," and that "[n]o restrictions/limitations [were] supported from an orthopedic standpoint." (AR 408.)

On January 11, 2016, Defendant sent the multidisciplinary peer panel review to Dr. Yue and Dr. Ligham for review and comments. (ECF No. 19 ¶ 67.) Dr. Yue responded that he did not agree with the panel's review, and indicated his view that Plaintiff demonstrated "myelopathy and loss of bladder function and gait weakness." (AR 180.) In a letter dated March 2, 2016, Dr. Ligham provided his medical opinion that Plaintiff continued to have "significant functional deficits involving strength and dexterity of her bilateral upper extremities as well as significant and substantial disability of the lumbar spine which limits her ability to stand, walk and bend." (AR 152-53.) Dr. Ligham reiterated his conclusion that he could "say with a reasonable degree of medical certainty that [Plaintiff] has been totally disabled from any work since March of 2010." (AR 153.) Dr. Ligham noted that he had been caring for Plaintiff for a total of fourteen years. (AR 152.)

After receiving Dr. Ligham's response, Defendant requested that Dr. Soo review the response and consult with Dr. Ligham. (AR 2171-72.) On March 21, 2016, Dr. Soo provided his opinion that the additional information provided by Dr. Yue and Dr. Ligham did not change his prior assessment. (AR 0140.) Dr. Soo opined that "there was no evidence to support significant motor strength, sensory, or range of motion deficits on physical examination," that "there are still no clinical findings to support the diagnosis of myelopathy," and that "[n]o restrictions/limitations are supported from an orthopedic standpoint during the time period in question." (AR 140-41.) Dr.

Soo indicated in his addendum report that he called Dr. Yue and Dr. Ligham, each on three separate occasions in March 2016, but did not indicate that he spoke with either of them. (AR 139-40.)

On April 12, 2016, Defendant requested that Plaintiff complete an Education & Work Experience questionnaire. On April 26, 2016, a Vocational Rehabilitation Specialist employed by Defendant performed a Transferable Skill Analysis and Labor Market Survey based on the information received from Plaintiff, Dr. Yue's April 7, 2015 PCE, and Dr. Lonseth and Dr. Soo's opinions on Plaintiff's functionality. (AR 11-19.) The report listed five occupations consistent with sedentary or light physical restrictions, within the plaintiff's education, training, and experience level, and that fell within the plaintiff's target wages, such that they were deemed to be viable employment options for Plaintiff. (ECF No. ¶ 90; AR 12-13.)

On May 12, 2016, Defendant denied Plaintiff's appeal. (AR 3.) Defendant's denial letter stated that "[b]ased on review of all documentation, Guardian determined to send the file for a multidisciplinary peer panel review with a board certified orthopaedic spine surgeon and a[n] anesthesiology/pain medicine physician." (AR 8.) After summarizing Dr. Lonseth's and Dr. Soo's conclusions, Defendant's denial letter concluded: "Based upon review of all information in file, it has been determined that Guardian has not been provided with sufficient medical documentation to support Ms. Johnson's disability, or inability to perform the major duties of any gainful work for which she is, or may become, qualified by training, education, or experience, as of May 12, 2015." (ECF No. 19 ¶ 95; AR 9-10.)[8] Plaintiff filed this suit on July 7, 2016. (ECF No. 1.) The parties filed cross-motions for summary judgment. (ECF Nos. 16 and 17.)

---

[8] As of the date of Defendant's appeal denial, Defendant had not received documentation from the Social Security Administration regarding Plaintiff, which Plaintiff's counsel had requested but represented to Defendant that he never received. (ECF No. 19 ¶¶ 92-93.) Defendant was, however, informed by Plaintiff's social security attorney of the ALJ's decision in Plaintiff's favor. (AR

## II.   Legal Standards

### A.  Summary Judgment

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (internal quotation marks and citations omitted). "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Id.* (quotation marks omitted).  On summary judgment a court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Phillip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).  The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25 (1986).  If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir. 2011). In this case, both sides have moved for summary judgment and while each disputes a few of the other's characterizations of the facts, neither contends that there is a genuine issue for trial.

### B. ERISA Standard of Review

When an ERISA plan participant challenges a denial of benefits, the proper standard of review is de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "[W]here the plan grants the administrator

---

1199.) Defendant acknowledged receipt of additional medical documentation sent by Plaintiff in March and April 2016. (ECF No. 19 ¶ 94.)

discretionary authority to determine eligibility benefits, a deferential standard of review applies." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 132 (2d Cir. 2008). Under a deferential standard, a court may not reverse the administrator's conclusion unless it is arbitrary and capricious. *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995).

Plaintiff does not contest that the plan's documents confer discretionary authority on Defendant.[9] The Court must therefore evaluate Plaintiff's claim using the arbitrary and capricious standard, under which "[a] court may overturn an administrator's decision to deny benefits only if the decision was 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (quoting *Pagan*, 52 F.3d at 442). The question before a reviewing court under the arbitrary and capricious standard is whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Jordan v. Retirement Comm. of Rensselaer Polytechnic Institute*, 46 F.3d 1264, 1271 (2d Cir. 1995). "The Court may not upset a reasonable interpretation by the administrator." *Id*. "Where both the plan administrator and a spurned claimant offer rational, though conflicting, interpretations of plan provisions, the administrator's interpretation must be allowed to control." *McCauley*, 551 F.3d at 132 (internal citation omitted). "Nevertheless, where the administrator imposes a standard not required by the plan's provisions, or interprets the plan in a manner inconsistent with its plain words, its actions may well be found to be arbitrary and capricious." *Id*. (internal citation omitted).

---

[9] Plaintiff's opposition brief states, "Plaintiff does not contend that the plan's documents confer discretionary authority to the defendant." (ECF No. 16-1 at 20.) This appears to be a typographical error, as Plaintiff proceeds to analyze her claim under a deferential standard of review only. (*See id*. at 20-40.)

Substantial evidence is "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator] and . . . requires more than a scintilla but less than a preponderance." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995). The Court is limited to review of the administrative record, *id.* at 1071, unless there is "good cause" to consider evidence outside the administrative record. *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 631 (2d Cir. 2008).

ERISA requires that claims for benefits be afforded a "full and fair review by the appropriate named fiduciary of the decision denying the claim." *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 86 (2d Cir. 2009) (quoting 29 U.S.C. § 1133(2)). Courts in this District have held that this requires that the fiduciary give "fair consideration to both sides of the case." *Crocco v. Xerox Corp.*, 956 F. Supp. 129, 140 (D. Conn. 1997), *aff'd in part and rev'd in part on other grounds*, 137 F.3d 105 (2d Cir. 1998). However, courts may not require "administrators automatically to accord special weight to the opinions of a claimant's physician." *Black & Decker Disab. Plan v. Nord*, 538 U.S. 822, 834 (2003); *see also Demirovic v. Bldg. Serv. 32 B-J Pension Fund*, 467 F.3d 208, 212 (2d Cir. 2006) ("Although plan administrators may not arbitrarily refuse to credit the reliable evidence put forth by a claimant . . . there is no heightened burden of explanation . . . when they reject a treating physician's opinion . . .") (quoting *Black & Decker*, 538 U.S. at 834).

### III.  Discussion

#### A.  Whether Defendant Conducted a Full and Fair Review and Reached a Decision Supported by Substantial Evidence

Plaintiff argues that even under a deferential standard of review, Defendant's decision to terminate Plaintiff's benefits is not supported by substantial evidence. (ECF No. 16-1 at 26.)

Specifically, Plaintiff argues that Dr. Lonseth's and Dr. Soo's opinions were "completely contrary to the extensive five year medical history" contained in the administrative record, as Dr. Lonseth and Dr. Soo found no objective basis to support any functional limitations as of May 12, 2015, despite the fact that Defendant found her disabled for five years and Plaintiff underwent a serious thoracic surgery in December 2015. (ECF No. 16-1 at 27.) Plaintiff also argues that Dr. Lonseth and Dr. Soo provided inadequate reasoning for their conclusions. (ECF No. 16-1 at 27.)

Defendant's conclusion that Plaintiff was no longer disabled within the meaning of the Plan was based primarily on the conclusions of Dr. Lonseth and Dr. Soo, who conducted a "multidisciplinary peer panel review" of Plaintiff's file. Some aspects of Dr. Lonseth's and Dr. Soo's processes reflect a "full and fair review": Dr. Lonseth and Dr. Soo were independently retained physicians who certified that they had no conflict of interest in performing the review. (AR 392, 409.) Both were board-certified physicians in their respective fields. (AR 392, 409.) Both apparently reviewed Plaintiff's medical documentation, providing summaries of the relevant documentation. (AR 359-392, 396-409.) Both attempted unsuccessfully to contact Plaintiff's treating physicians to resolve discrepancies between their conclusions and those of Plaintiff's treating physicians. (AR 139-40, 388, 405-06.) In addition, Defendant listed all of the evidence it considered in its denial letter, providing a more detailed explanation than the "catch-all statements" that courts have found to be indicative of arbitrary and capricious decisions. *See Jones v. Life Ins. Co. of N. Am.*, 829 F. Supp. 2d 165, 173 (W.D.N.Y. 2011) (finding that plaintiff submitted substantial evidence regarding his physical limitations, but that defendant provided a "catch-all statement" in its determination letter that it considered the evidence).

Dr. Lonseth's and Dr. Soo's reports also suffer from serious flaws, however, and those flaws undermine Defendant's conclusion that Plaintiff was no longer disabled. First, the medical

documentation Dr. Lonseth and Dr. Soo reviewed contradicts several of their key conclusions. For example, Dr. Lonseth's summary of Dr. Rathi's June 28, 2013 medical record states, "Physical examination failed to show any documented motor, sensory or reflexive abnormality." (AR 329.) This contradicts the June 28, 2013 medical record itself, in which Dr. Rathi wrote, "The patient has some element of giveaway weakness and other elements of diminished strength particularly evident with grip testing . . . . Deep tendon reflexes show marked enhancement particularly evident in the lower limbs." (AR 571.) Dr. Rathi indicated that he found the results of the examination "remarkabl[e]" and had a "lengthy discussion" with Plaintiff about the need for another cervical spine MRI and possible additional testing. (AR 571-72.) Dr. Lonseth's review of Dr. Rathi's August 27, 2015 note is similarly misleading. Dr. Lonseth summarized that record by writing, in relevant part, "There was no sensory or motor deficit to the upper or lower extremities documented." (AR 384.) The record itself states, however, "Motor examination of the limb shows the patient with diminished grip strength bilaterally perhaps more so on the left. She has increased neck pain with proximal motor testing in the upper limbs." (AR 745.) In the same record, Dr. Rathi expressed disagreement with the notion that Plaintiff could return to work because "she remains in severe pain," and "the pathology of her thoracic spine has not been addressed to date." (AR 744.) Dr. Rathi's notes document physical examinations and refer to "abnormalities" (AR 745) and the "uniqueness of [Plaintiff's] examination findings." (AR 571.) Despite allegedly reviewing these notes, Dr. Lonseth concluded, "there are no pertinent physical examination findings to support impairments. Most notes did not include physical examination findings and those that do show nothing abnormal." (AR 388-89.) Dr. Lonseth's report thus ignores or glosses over critical evidence in the record.

Similarly, Dr. Soo summarized Dr. Rathi's findings as noting a "slight diminished grip strength on the left on the upper extremities," although neither the June 28, 2013 record nor the August 27, 2015 note suggests that the diminished grip strength was "slight;" and Dr. Soo did not address at all Dr. Rathi's documentation of "abnormalities." (AR 404.)[10] Dr. Soo concluded following his discussion with Dr. Lonseth that "there was no clear evidence of significant deficits upon assessment," but did not explain how Dr. Rathi's findings squared with this conclusion. (AR 406.)

Because Defendant relied primarily on Dr. Lonseth's and Dr. Soo's opinions in deciding to terminate benefits, Defendant is saddled with the contradictions between those opinions and the evidence in the record. Such contradictions may be a basis for finding a plan administrator's decision to be arbitrary and capricious. *See Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 489 (2d Cir. 2013) (finding administrator's denial of benefits arbitrary and capricious in part because administrator "failed to support many of its assertions with sound reasoning in the record and, in some instances, made assertions that are contradicted by the record").

Second, while ERISA does not require administrators to conduct in-person, independent examinations of claimants, *see Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 90 (2d Cir. 2009) (holding that defendant could have, but was not required to, order an in-person independent medical examination, and acknowledging "the commonplace practice of doctors arriving at professional opinions after reviewing medical files") (internal quotation marks omitted), Defendant's failure to perform an in-person examination in this case weighs against Defendant. Although the Plan itself does not require Defendant to conduct a physical examination of the

---

[10] Dr. Soo's summary cites an October 27, 2015 neurology evaluation with Dr. Rathi, but this appears to be a typo and a reference to the August 27, 2015 record.

claimant as part of a full and fair review (AR 1848),[11] both Dr. Soo and Dr. Lonseth noted that "an FCE [functional capacity evaluation] may be helpful." (AR 389, 406.) Both also made other comments suggesting that a physical examination of the Plaintiff would be necessary to draw firm conclusions about the extent of her impairments. (*See, e.g.*, AR 367 (noting "further clinical reports by Dr. Ligham that . . . failed to demonstrate physical examination findings"), 406 (noting that "physical examinations were lacking").) While both also suggested that the conclusions of her treating physicians were not adequately supported by physical examination findings, her treating physicians at least had the benefit of observing her in-person, and one had done so for fourteen years. "[T]he length and nature of [the treating provider and plaintiff's] relationship, the level of the doctor's expertise, and the compatibility of the opinion with the other evidence" are factors a court may consider in evaluating whether a termination of benefits complies with ERISA. *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 135 (2d Cir. 2001); *see also Black & Decker*, 538 U.S. at 832 (noting importance of considering duration of provider-patient relationship). As noted, all of Plaintiff's treating physicians ultimately concluded that she was unable to work. Defendant's decision not to conduct the FCE suggests that Defendant did not perform as full a review as it could have.

Third, while Plaintiff's medical documentation reflects a complicated picture of a claimant whose health was in flux over six years, Dr. Lonseth's and Dr. Soo's reports fail to acknowledge any nuance, presenting instead black-and-white conclusions that Plaintiff's file contained "*no pertinent physical examination findings to support impairments*" (AR 282-83), that any physical examination findings showed "*nothing* abnormal" (AR 283), and that "*no* restrictions/limitations"

---

[11] The Plan provides that "in deciding an appeal based upon a medical judgment," Defendant will "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment . . . ." (AR 1848.)

were supported by the record. (AR 301 (emphasis added).) Although not every medical note in Plaintiff's file supports a finding of disability, Dr. Lonseth's and Dr. Soo's blanket statements that *nothing* in the record supported Plaintiff's claim cannot be squared with the record—as shown in the examples cited above—at least in the absence of any explanation by Drs. Lonseth and Soo of how the record could support such definitive conclusions. *See Spears v. Liberty Life Assur. Co. of Boston*, No. 3:11-CV-1807 (VLB), 2015 WL 1505844, at *26 (D. Conn. Mar. 31, 2015) (finding a denial of benefits arbitrary and capricious in part because the peer review report offered little analysis with its conclusion that plaintiff's medical records did not support any specific limitations or restrictions).

Fourth, Dr. Lonseth's and Dr. Soo's unqualified assertions—which Defendant adopted—are especially jarring in light of Defendant's five-year history of finding Plaintiff eligible for LTD benefits. "Decisions to terminate benefits in the absence of a change in condition have been held to have been arbitrary and capricious." *Rappa v. Conn. Gen. Life Ins. Co.*, No. 06-CV-2285 (CBA), 2007 WL 4373949, at *10 (E.D.N.Y. Dec. 11, 2007) (finding that despite defendant's position that plaintiff had improved, there was no basis in the record to conclude that the condition defendant originally found to be disabling had in fact improved) (citing *Connors*, 272 F.3d at 136). An administrator's past payment of benefits does not "operate[] forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments." *Dunda v. Aetna Life Ins. Co.*, No. 6:15-CV-6232-MAT, 2016 WL 3552187, at *7 (W.D.N.Y. June 30, 2016) (quoting *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002)). *See also Richter v. Metro. Life Ins. Co.*, No. 15CV8266 (LAK) (DF), 2017 WL 3172848, at *49 (S.D.N.Y. Feb. 27, 2017), *report*

*and recommendation adopted in part*, No. 15-CV-8266 (LAK), 2017 WL 3172763 (S.D.N.Y. July 24, 2017) (rejecting the claim that the administrator's "evolving view of Plaintiff's alleged condition" justified a re-review of plaintiff's claim and eventual termination of benefits, as later documents continued to support plaintiff's claimed disability); *Barbu v. Life Ins. Co. of N. Am.*, 35 F. Supp. 3d 274, 281, 290-91 (E.D.N.Y. 2014) (holding that "plaintiff continues to meet the Policy's definition of disabled in part because [defendant] itself reached that conclusion on several occasions, and reversed course based on the purported absence of current evidence, rather than on the affirmative evidence in the medical records, all of which supports [defendant's] original determination that plaintiff is disabled").

Defendant contends that it changed course after receiving Dr. Yue's April 7, 2015 PCE stating his view that Plaintiff could perform light sedentary work, and in reliance on Dr. Yue's August 20, 2014 record noting that Plaintiff was "doing well overall" and that she had reduced her pain medications. (ECF No. 31 at 7.) But Defendant did not explain why it credited Dr. Yue's April 7, 2015 opinion—which Dr. Yue later reversed to clarify that he continued to believe Plaintiff had no functional capacity for sedentary work—or the August 20, 2014 progress note over Plaintiff's other doctors' opinions that Plaintiff's condition had not changed, other notes from Dr. Yue documenting Plaintiff's continued pain and functional limitations, and Defendant's own prior eligibility determinations made over the course of five years. Dr. Yue's single progress note indicating that Plaintiff was "doing well overall," in the context of considerably less optimistic notes from Dr. Yue, Dr. Ligham, and Dr. Rathi both before and after the August 20, 2014 visit[12]

---

[12] *See, e.g.*, AR 590 (Dr. Yue's May 9, 2012 opinion that Plaintiff's exam "showed evidence of continued weakness, continued loss of coordination in her upper extremities especially, and continued neck and arm pain bilaterally); AR 1181 (Dr. Ligham's December 19, 2012 opinion that Plaintiff's "chronic severe pain, chronic fatigue and significant medications affect her ability to focus and maintain concentration to any task"); AR 1184 (Dr. Rathi's September 23, 2013 opinion

cannot reasonably be considered evidence of a "significant change in [plaintiff's] physical condition." *See Connors*, 272 F.3d at 136 ("Had the District Court recognized that [defendant's] finding of ineligibility was not in response to an application for benefits, but rather a reversal in policy preceded by no significant change in [plaintiff's] physical condition, it may have accorded less weight to the evidence presented by [defendant]."). In its denial letter, Defendant makes no attempt to explain its reversal, and Defendant otherwise fails to point to adequate evidence of a change in condition in the record.

One illustration of Defendant's reversal, and failure to explain its change of view, involves Plaintiff's upper extremity limitations. Defendant found Plaintiff's upper extremity limitations to be an important factor in its 2013 eligibility determination, when it noted that Plaintiff's numbness in her fingers would prevent her from performing even sedentary work. (AR 2109.)[13] Neither Dr. Soo nor Dr. Lonseth, however, mentions upper extremity limitations in his conclusions. (AR 390-91, 406-08.) Even after Dr. Ligham reiterated his opinion in March 2016 that Plaintiff's use of her upper extremities was limited (AR 152-53), Dr. Soo did not address this in reconsidering his conclusions in his "addendum review."[14] (AR 140-41.) Indeed, Dr. Soo's conclusion following the

that Plaintiff had "disabling pain" and was "completely disabled"); AR 744 (Dr. Rathi's August 27, 2015 opinion that Plaintiff "remains in severe pain and . . . the pathology of her thoracic spine has not been addressed"); AR 816 (Dr. Yue's September 23, 2015 note that Plaintiff reported "burning pain in her thoracic spine . . . extending down into her legs"); AR 153 (Dr. Ligham's March 2, 2016 opinion that Plaintiff's "complaints are consistent with her clinical presentation," and that there "has been no evidence of malingering or symptom magnification").

[13] Several documents in the record identify Plaintiff's upper extremity limitations prior to Defendant's denial of her claim: Defendant's January 22, 2011 review of her eligibility (AR 2030); Dr. Ligham's August 30, 2012 opinion (AR 1182-83); Dr. Ligham's December 19, 2012 opinion (AR 1181); Dr. Rathi's June 28, 2013 medical exam notes (AR 571-72); Defendant's September 19, 2013 periodic review (AR 2105); Kerry A. Skillin's September 26, 2013 vocational opinion (AR 1203-04); Dr. Yue's October 9, 2013 notes (AR 597); Defendant's December 13, 2013 notes (AR 2109); and Dr. Rathi's August 27, 2015 medical examination notes (AR 745).

[14] After receiving responses from Plaintiff's treating physicians expressing their disagreement with the peer panel's conclusions, Defendant asked Dr. Lonseth and Dr. Soo to review the responses

addendum review was virtually identical to his prior conclusion. (*Compare* AR 140-41 *with* AR 407-08.) Defendant makes no attempt to explain in its denial letter the discrepancies between its previous acknowledgements of Plaintiff's history of upper extremity limitations and Dr. Lonseth's and Dr. Soo's virtual silence on this point. (*See* AR 6-10.)

Defendant does point out that Dr. Yue's April 7, 2015 PCE reported that Plaintiff "could use her hands for repetitive actions such as simple grasping, firm grasping, fine manipulation and pushing/pulling" (ECF No. 31 at 28), and that the surveillance video showed Plaintiff "exiting a store with a large purse hanging from the crook of her arm while talking on a cell phone as she walked to her car." (ECF No. 31 at 29.) Defendant also contends that its vocational rehabilitation specialist took into account Plaintiff's limitations in the Transferable Skills Analysis and Labor Market Survey, eliminating activities requiring "repetitive use." (ECF No. 31 at 25.) But the Transferability of Work Skills Worksheet does not reflect independent consideration of the upper extremity limitations documented in the record, relying instead on Dr. Yue's PCE and Dr. Lonseth's and Dr. Soo's opinions as the basis for the analysis. (AR 12.) As for Dr. Yue's April 7, 2015 PCE, as noted, a full and fair review of the record would have considered that document in the context of all of Dr. Yue's treatment records and impressions, including his opinion only six months later that Plaintiff was not able to perform either light or sedentary work. (AR 810-12.) Defendant does not explain how it took into account reports of Plaintiff's upper extremity limitations, and why these reports were discounted. Seizing on one or two records in a voluminous set generated by a long treatment history is the sort of "cherry-picking" of evidence that courts have found to be an abuse of discretion under ERISA. *See Delprado v. Sedgwick Claims*

_____

and to prepare addendum reports regarding whether the additional information provided changed their conclusions. (ECF No. 19 ¶ 83; AR 133-35.) Dr. Soo provided an addendum report on March 21, 2016. (AR 137-42.)

*Mgmt. Servs., Inc.*, No. 1:12-CV-00673 (BKS/RFT), 2015 WL 1780883, at *30 (N.D.N.Y. Apr. 20, 2015) ("An administrator may, in exercising its discretion, weigh competing evidence, but it may not . . . cherry-pick the evidence it prefers while ignoring significant evidence to the contrary.") (quoting *Winkler v. Metro. Life Ins. Co.*, 170 F. App'x. 167, 168 (2d Cir. 2006)). [15]

Especially in light of Defendant's history of finding Plaintiff disabled, the basis on which Defendant dismissed Dr. Yue's and Dr. Ligham's 2016 statements of disagreement with Dr. Lonseth's and Dr. Soo's conclusions constitute further evidence that Defendant acted arbitrarily. Defendant contends that it did not credit the 2016 opinions of Plaintiff's treating physicians because neither Dr. Yue nor Dr. Ligham supported their disagreement with Defendant's conclusion with "clinical findings" or "clinical documentations." (AR 8-9.) Dr. Yue sent a handwritten note stating that he did "not agree" with the conclusions of the peer panel review, and that, in his view, Plaintiff suffered from myelopathy, loss of bladder function, and gait weakness. (AR 180-81.) He did not attach any documentation to this note—which was apparently the basis for the Defendant's conclusion that it was not supported by "clinical" evidence. However, the record includes an October 28, 2015 treatment note by Dr. Yue that Plaintiff was "losing neurological function including bladder function and ambulatory issues," a note made in connection with an examination of Plaintiff. (AR 706.) It is not clear why this would not qualify as "clinical" evidence, especially given that Defendant had previously relied on similar evidence

---

[15] Defendant's implication that it need not have considered Plaintiff's upper extremity limitations on the grounds that Plaintiff's only disabling diagnosis is her cervical spinal stenosis with severe headaches and cervical fusion is equally unavailing. "The 'question of whether or not a claimant is disabled must be judged according to the terms of the policy.'" *DeCesare v. Aetna Life Ins. Co.*, 95 F. Supp. 3d 458, 480 (S.D.N.Y. 2015) (internal quotation marks omitted)). The Plan defines "Disability or Disabled" as a claimant having "physical, mental or emotional limits caused by a current sickness or injury. And, due to these limits, [the claimant is] not able to perform the major duties of [her] own occupation or any gainful work." (AR 1839.) The Plan does not require that the Plaintiff prove disability only with respect to the condition that caused her to stop working.

in finding Plaintiff to be disabled. Similarly, Dr. Ligham's March 2, 2016 explanation of his disagreement, referring to "significant functional deficits involving strength and dexterity of [Plaintiff's] bilateral upper extremities as well as significant and substantial disability of the lumbar spine which limits her ability to stand, walk and bend" (AR 152-53) echoed his earlier findings: Dr. Ligham had previously referred in an August 30, 2012 note to Plaintiff's "extremity numbness and weakness." (AR 1182.) (Dr. Yue had similarly noted "toes and fingers numbness and right arm numbness" in his October 9, 2013 report (AR 597).) Again, Defendant does not explain why these findings are not "clinical," or why Dr. Yue's and Dr. Ligham's failure to reattach this documentation to their notes expressing disagreement with the peer panel's conclusions, when the documentation was already in the record, affected Plaintiff's claim.

A full and fair review requires that an administrator consider all of the pertinent information "reasonably available," *Crocco*, 956 F. Supp. at 139. That Defendant decided not to conduct an in-person examination when the peer panel advised that a functional capacity evaluation could have been helpful, and that the peer panel (and Defendant) discounted several of Plaintiff's physicians' opinions and notes, without more specific explanation than blanket statements that the years of medical notes did not rely on clinical documentation, together suggest that Defendant did not conduct a full and fair review of Plaintiff's claim.[16]

_____

[16] Plaintiff also argues that Defendant failed to take into account her credible complaints of chronic pain and lack of concentration due to pain medications, but this argument is less persuasive. (ECF No. 16-1 at 37-38.) "[T]he subjective element of pain is an important factor to be considered in determining disability." *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir. 2001). "[I]t is arbitrary and capricious to disregard evidence simply because it is subjective." *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 486 (2d Cir. 2013) (finding that defendant did not give adequate attention to subjective complaints, as it failed to either assign any weight to them or to provide specific reasons for its decision to discount them). "Thus, a reviewing court is obliged to determine whether a plan administrator has given sufficient attention to the claimant's subjective complaints before determining that they were not supported by objective evidence." *Id.* (internal citations and alterations omitted). Here, Defendant's denial letter noted in its discussion of Dr.

**B.  Weight of Defendant's Conflict of Interest**

Defendant's inherent conflict of interest and certain "procedural irregularities" also weigh in favor of finding that its decision to terminate benefits was arbitrary and capricious. Where a plan administrator has the dual role of both evaluating and paying benefits, the administrator has an inherent conflict of interest. *See Diamond v. Reliance Standard Life Ins.*, 672 F. Supp. 2d 530, 536-37 (S.D.N.Y. 2009) ("[A]s a matter of law, [Defendant] has a conflict of interest since it both has the discretion to decide whether benefits will be paid, and it is the payor of those benefits.") (internal citation omitted). The reviewing court must weigh that conflict as a factor in determining whether there has been an abuse of discretion. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008); *see also Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82-83 (2d Cir. 2009) (a conflict of interest will "weigh as a factor in determining whether there was an abuse of discretion, but it does not make de novo review appropriate"). "The weight given to the existence of the conflict of interest will change according to the evidence presented." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008).

> Where circumstances suggest a higher likelihood that [the conflict] affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration, the conflict of interest should prove more important (perhaps of great importance) . . . It should prove less important (perhaps to a vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Id*. (quoting *Glenn*, 554 U.S. at 117).

---

Lonseth's opinion that Plaintiff's "pain medicine treatment dates back to 2002, and she is stable on current doses of medications including long term use of opioids; with no adverse effects," (AR 8), suggesting that Defendant took Plaintiff's subjective complaints of pain into account.

The Second Circuit has "declined to assign any weight to a conflict of interest in the absence of any evidence that the conflict actually affected the administrator's decision." *Roganti v. Metro. Life Ins. Co.*, 786 F.3d 201, 218 (2d Cir. 2015) (where defendant submitted an unrebutted affidavit averring that defendant's business and finance departments are kept separate from plan administration, that the claim administrator did not consider finances in connection with his determinations, and that compensation was not tied to the outcome of benefit claims, a conflict of interest would be accorded no weight) (internal quotation marks omitted). A "smoking gun is not always required," and "an irrational decision or a one-sided decisionmaking process can alone constitute sufficient evidence that the administrator's conflict of interest actually affected the challenged decision." *Id.*

Defendant submitted an affidavit by its employee Melanie Wiltrout stating that Defendant's "Group Claims Department has always been positioned in a separate location, removed from the business/profit areas of the company"; that "[n]one of the employees involved with the adjudication of the plaintiff's claim have any decision-making responsibilities within the business/profit areas of" Defendant; and that "[a]t all relevant times, [Defendant] has conduct management checks to identify and correct inaccurate claims handling, irrespective of whom the inaccuracy benefits," including "random file reviews and progress/performance discussions," as well as "[r]egular quality assurance reviews . . . conducted on a sample-size of claims caseloads." (ECF No. 31-1 at 3.) Defendant's responses to plaintiff's first set of interrogatories also state that there were no employee incentive programs applicable to the sole employee responsible for the decision to deny Plaintiff's claim, Teresa Crouthamel. (ECF No. 31-1 at 7.) Plaintiff argues that Defendant's representations regarding "walling off" are too general to quell any concerns about a conflict of interest. Plaintiff also points to documents in the record showing that Plaintiff's claim

handler, Teresa Crouthamel, was involved in calculating Plaintiff's social security underpayment. (AR 2122-24.)

The Wiltrout affidavit, though somewhat general, does suggest that Defendant has taken steps to "wall off" financial decisions from claims administration as contemplated by *Glenn*. That Crouthamel was involved in calculating Plaintiff's underpayment does not suggest that she had a conflict of interest—i.e., Crouthamel's involvement in the calculation of benefits gives her no more of a stake in the outcome of a claim than does her participation in the assessment of the claim itself, as she presumably knew that denial of a claim would have a positive financial impact on Defendant. Nonetheless, the affidavit does not say whether Crouthamel had discussions with financial personnel about Plaintiff's claims, or whether her performance evaluations took account of the financial impact of benefits decisions on the Defendant. Thus, the Wiltrout affidavit does not constitute conclusive evidence that the benefits decision in this case was completely insulated from Defendant's financial interests.

In addition, the timing of Defendant's decision to terminate benefits, as well as the fact that Defendant ignored a social security determination in Plaintiff's favor after encouraging her to seek that determination—what courts in the Second Circuit have referred to as "procedural irregularities in the administrative process"—suggest that the conflict of interest may have impacted Defendant's decision in this case. "Procedural irregularities" are additional factors to be considered in determining whether an administrator's denial of benefits was arbitrary and capricious and include:

> (1) initially providing one reason for denying a benefits claim, and then offering a new reason for the denial on review, in addition to the original reason . . . (2) emphasizing a certain medical report that favors a denial of benefits, and deemphasizing certain other reports that suggest a contrary conclusion . . . (3) relying on the opinions of its own non-treating physicians over the opinions of plaintiff's treating physicians . . . (4) reversing its initial decision to award benefits

> despite not receiving any new medical information . . . (5) encouraging the claimant to argue to the Social Security Administration that he could do no work and then ignoring the agency's finding in drawing its own conclusion.

*Diamond*, 672 F. Supp. 2d at 536 (collecting cases) (internal quotations, citations, and alterations omitted); *see also Demonchaux v. Unitedhealthcare Oxford*, No. 10 Civ. 4491 (DAB), 2012 WL 6700017, at *10 (S.D.N.Y. Dec. 20, 2012) (finding that procedural irregularities in the adjudication of plaintiff's claim was evidence that defendant's decision was arbitrary and capricious).

The timing of Defendant's decision to request a PCE and additional information from Plaintiff—days after Plaintiff complained of underpayment of benefits[17]—suggests that Defendant's conflict of interest may have impacted its decision to terminate Plaintiff's benefits. On August 8, 2014, Defendant undertook a periodic review of Plaintiff's eligibility for benefits, noting, "Medical supports limitations to cont benefits *diary for 2016* . . . ." (ECF No. 16-1 at 11-12; AR 2119 (emphasis added).)   On February 18, 2015 and February 24, 2015, however, Defendant learned that Plaintiff's benefit payment had to be recalculated to correct for an underpayment, as Plaintiff's benefits could no longer be offset by social security payments received by her son. (AR 2123-24.) Only a few days later, between February 25, 2015 and March 4, 2015, Defendant requested a PCE from Plaintiff and called her to request updated information. (AR 2125-26.) Plaintiff called in response and "was very upset that [Defendant] was asking for updated info already." (AR 2126.)

Defendant contends that it is entitled under the Plan to require a claimant to "[g]ive periodic medical updates" (AR 1824) and that previously, Defendant conducted reviews of Plaintiff's file in intervals of three to ten months. (ECF No. 31 at 29.) On its own, it was not an abuse of discretion

---

[17] As noted above, Defendant's notes indicate that it learned from Plaintiff on February 18, 2015 that Plaintiff's son was no longer receiving social security benefits on the basis of her disability, and there was thus no longer a basis to offset her LTD benefit payment. (AR 2123.)

to undertake a periodic review in early 2015. But the timing of that particular review suggests that the prospect of increasing Plaintiff's benefit amount may have influenced Defendant's decision to change course after five years and find Plaintiff no longer eligible for benefits.

Defendant's "decision to terminate benefits in the face of a social security determination to the contrary" is also a factor for consideration in determining whether Defendant's decision was arbitrary and capricious, and in particular, how much the structural conflict of interest should weigh in the analysis. *Barber v. Sun Life & Health Ins. Co.*, 894 F. Supp. 2d 174, 185 (D. Conn. 2012). "Courts have found SSA determinations especially relevant when the plan administrator (1) encourages the applicant to apply for SSD payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability." *Dunda v. Aetna Life Ins. Co.*, No. 6:15-CV-6232-MAT, 2016 WL 3552187, at *7 (W.D.N.Y. 2016) (internal quotation marks and alterations omitted); *see also Glenn*, 554 U.S. at 118 (finding the fact that the administrator "had encouraged [the plaintiff] to argue to the [SSA] that she could do no work, received the bulk of the benefits of her success in doing so . . . , and then ignored the agency's finding . . . . was not only an important factor in its own right . . . but also would have justified the court in giving more weight to the conflict"). Defendant requested that Plaintiff file a disability claim with the SSA, referred her to an attorney selected by Defendant for assistance with that case, paid for that attorney to argue Plaintiff's eligibility for disability benefits to the SSA, and also paid for a vocational expert to support her case. (AR 1506-07.) The SSA found in Plaintiff's favor, and Plaintiff's social security attorney informed Defendant of the ruling. (AR 1199.) Although Defendant apparently did not have access to Plaintiff's social security file, (ECF No. 18 at 17-18), Defendant was aware of the

SSA's finding—and benefited from it—and does not explain what weight it gave that finding in its decision.[18]

### C. Conclusion

After weighing the relevant factors, the Court concludes that Defendant's decision to terminate Plaintiff's benefits was arbitrary and capricious. After repeatedly finding Plaintiff disabled for a period of five years, Defendant decided, unprompted, to conduct a new review of Plaintiff's eligibility shortly after learning that it was underpaying Plaintiff; Defendant encouraged Plaintiff to argue her disability case to the SSA, but then did not—or failed to adequately explain why it did not—consider the SSA's ruling in Plaintiff's favor; Defendant has a conflict of interest as the decision maker and payor of benefits; Defendant's denial rested primarily on the opinions of two non-treating physicians who did not examine Plaintiff and whose opinions were not supported by key parts of the record; Defendant singled out a PCE and single progress note from Plaintiff's treating orthopedist from a lengthy medical history put forth by at least three treating physicians, including the same orthopedist that documented substantial impairments over a long period; Defendant gave an inadequate explanation for its reversal of course after five years of finding Plaintiff to be disabled; and Defendant failed to consider adequately Plaintiff's upper

---

[18] Other "procedural irregularities" identified by courts in the Second Circuit weigh in Plaintiff's favor as well, including the fact that Defendant relied more heavily on the reports of Dr. Lonseth and Dr. Soo, who did not examine Plaintiff, than on the opinions and notes of Dr. Ligham, Dr. Dr. Yue (apart from the August 20, 2014 medical notes and the April 7, 2015 PCE), and Dr. Rathi, all of whom had longstanding relationships with Plaintiff. Though this factor "would likely be present in nearly any case in which benefits are ultimately denied," it remains a factor weighing against Defendant. *See Diamond*, 672 F. Supp. 2d at 537 (finding that defendant's emphasis on reports that supported a denial of benefits and de-emphasis on reports that suggested a contrary conclusion weighed slightly against defendant, and that defendant's reliance on the opinions of non-examining physicians over the plaintiff's own treating physicians, while not on its own arbitrary and capricious, was a factor for consideration). That Defendant decided to change course after paying benefits for almost five years also weighs against Defendant as a "procedural irregularity." The Court discusses these issues fully in the context of the substantial evidence analysis, *supra*.

extremity limitations—a key difference between Plaintiff's functional capability to perform sedentary work and no work.

On the other hand, Defendant took seriously Plaintiff's pain complaints; Defendant's non-treating physician reviewers were board-certified and attempted to discuss their views with Plaintiff's treating physicians; Defendant considered a surveillance video showing Plaintiff getting in and out of a car and carrying items unassisted; and, Defendant received a PCE from Plaintiff's own treating physician stating his belief that, as of April 7, 2015, Plaintiff was capable of some amount of sedentary work.

Given the deferential standard of review, consideration of all of the factors suggests that this is a somewhat close case. In such a case, "any one factor will act as a tiebreaker when the other factors are closely balanced . . . ," *Glenn*, 554 U.S. at 117, and "the [insurer's] fiduciary interest may counsel in favor of granting a borderline claim while its immediate financial interest counsels to the contrary." *Id*. at 113. Here, the evidence suggests that Defendant's conflict tipped a somewhat close case against the Plaintiff. That is a violation of ERISA, which "imposes higher-than-marketplace quality standards on insurers" and "a special standard of care" requiring a plan administrator to "discharge its duties in respect to discretionary claims processing solely in the interests of the participants and beneficiaries of the plan . . . " *Id*. at 115 (internal quotation marks omitted). Considering the factors together, the Court concludes that Defendant's decision was arbitrary and capricious. Plaintiff is thus entitled to summary judgment on her claim.

### D. Remedy

Having decided that Defendant's termination of benefits was arbitrary and capricious, the Court must determine whether Plaintiff is entitled to reinstatement of benefits dating from May 12, 2015, or whether the Court should remand the case to Defendant for renewed evaluation of

Plaintiff's claim. *See Zurndorfer v. Unum Life Ins. Co. of Am.*, 543 F. Supp. 2d 242, 263 (S.D.N.Y. 2008) (determining whether reinstatement or remand was the appropriate remedy after concluding that defendant's termination was arbitrary and capricious). Where "no determination has been made as to the sufficiency of the evidence . . . . , remand is the appropriate procedure." *Wallace v. Grp. Long Term Disab. Plan for Employees of TDAmertrade Holding Corp.*, No. 13 Civ. 6759 (LGS), 2015 WL 4750763, at *4 (S.D.N.Y. Aug. 11, 2015). By contrast, "remand of an ERISA action seeking benefits is inappropriate where the difficulty is not that the administrative record was incomplete but that a denial of benefits based on the record was unreasonable." *Zervos v. Verizon N.Y. Inc.*, 277 F.3d 635, 648 (2d Cir. 2002); *see also Diamond v. Reliance Standard Life Ins.*, 672 F. Supp. 2d 530, 538 (S.D.N.Y. 2009) (ordering reinstatement of benefits after concluding that defendant's conduct was arbitrary and capricious). Although Plaintiff argues that reinstatement is appropriate, the Court "will typically not substitute [its] own judgment, but rather will return the claim for reconsideration unless [it] conclude[s] that there is no possible evidence that could support a denial of benefits." *Franzese v. United Health Care/Oxford*, 232 F. Supp. 3d 267, 281-82 (E.D.N.Y. 2017) (quoting *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 490 (2d Cir. 2013)) (internal quotation marks and citations omitted). Here, remand is appropriate to allow Defendant to properly consider all of the relevant medical evidence, to provide a fuller explanation of its conclusions, and, "if it wishes, to evaluate [Plaintiff]." *Miles*, 720 F.3d at 490.

\*     \*     \*

For the reasons stated above, Plaintiff's Motion for Summary Judgment is GRANTED. Defendant's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

                                            /s/
                                Michael P. Shea, U.S.D.J.

Dated:         Hartford, Connecticut
                October 27, 2017